```
             UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF OHIO
                   WESTERN DIVISION
```

James Perkins,                 :   Case No. 1:05-cv-818
                               :
    Plaintiff,                 :
                               :
vs.                            :
                               :
Hook-Superx, Inc., d/b/a CVS   :
Pharmacy,                      :
                               :
    Defendant.                 :

**ORDER**

Before the Court is Defendant's motion for summary judgment. (Doc. 36)  Plaintiff opposes the motion (Doc. 38), and Defendant has replied.  (Doc. 39)  Plaintiff contends that he was terminated from his job as a CVS Pharmacy store manager because of his disability, a contention Defendant disputes.

**FACTUAL BACKGROUND**

James Perkins started working for Superx Pharmacy in 1975. He became a CVS employee in 1997 following several mergers and acquisitions, but he worked continuously for CVS or its predecessors from 1975 until his termination in April 2005. Perkins was a store manager, generally responsible for the day-to-day management of a CVS retail outlet.  Perkins was never disciplined or sanctioned during his thirty years with the company.

Perkins served in the Marines during the Vietnam War and saw

active combat.  After his termination from CVS, he applied for and was granted a 10% disability rating from the Veterans Administration due to hearing loss caused by his combat exposure. (The VA also found him to be disabled based on post-traumatic stress syndrome, but that condition is unrelated to the merits of this dispute.)

Perkins became aware of his hearing deficit sometime in 1999.  He describes an incident involving his direct supervisor at the time, who banged on his store's back door for over half an hour, trying to get Perkins to let him in.  Perkins did not hear him banging.  The supervisor, Mr. Doepker (whom Perkins described as quite irate about the incident) insisted that Perkins get his hearing tested.  Perkins did so, and his July 23, 1999 hearing test report noted a "high frequency mild to moderate severe sensory neural hearing loss."  (Perkins Deposition Exhibit 25) The ENT physician who tested Perkins recommended in the report that Perkins consider amplification (hearing aids), and that he avoid undue noise exposure.  However, Perkins claims that his family doctor told him at the time that he would be completely deaf within five years, and that hearing aids would just be a waste of his money.  (Perkins Deposition pp. 36-37.)

Perkins testified that sometime after the 1999 incident with his supervisor, his employees started commenting to him about his hearing problem.  These comments included employees who told him

he wasn't paying attention to them, or that he had not heard the buzzer at the store's back door, or did not hear the telephone ring. One cashier told him about a 2005 incident with a customer, who told the cashier that Perkins "wasn't paying attention" to her. The cashier told the customer that Perkins had a hearing problem. Perkins was not aware of any other customer complaints about his hearing.

    Mr. Doepker, Perkins' supervisor who ordered him to get his hearing tested, transferred to a different district, and Terry Meyers became Perkins' supervisor in the spring of 2001. Perkins told Meyers about his increasing problems with his hearing. (Meyers testified in his deposition that he was aware of Perkins' hearing deficits.) In 2003, Meyers transferred Perkins from the Cheviot store, where he had worked for many years, to a store in Harrison, Ohio. That store was physically larger, in an older building with higher ceilings, although the store sales volume was lower than Cheviot's. Perkins testified that he asked Meyers not to transfer him to Harrison, because he was afraid that the store's acoustical properties would only increase his hearing difficulties. Meyers told him he had to transfer or risk losing his job, so Perkins accepted the transfer.

    Dave Seimetz became Perkins' district manager and direct supervisor on September 7, 2004. Seimetz admitted that Perkins was a good employee, although Seimetz was unsure of the precise

ratings he had given Perkins in the one evaluation he did before Perkins was terminated. Perkins contends that he also talked to Seimetz about his hearing deficits before his termination, something Seimetz denies.

Sometime in 2004 or 2005, Perkins received a company e-mail sent to store managers, describing a temporary job program in Texas. CVS had purchased some Eckerd stores and wanted CVS managers to "set up" those stores to CVS' own standards.[1] Perkins inquired about a position, saying he was interested in it because of his hearing problems. Perkins testified that he talked to Seimetz in February 2005 about the Texas job; Seimetz told him that the position had been filled but that he would keep Perkins in mind. (Perkins Deposition pp. 73-78.)

Events Leading to Perkins' Termination.

In mid-March 2005, Seimetz told Perkins he needed to reduce his budgeted employee time for the following work week, in order to make up a projected budget deficit. Perkins had already prepared his regular staff schedule for that week, and had posted his regular Sunday/holiday store hours of 10 a.m. to 6 p.m. After Perkins received Seimetz' order to reduce hours, however, he decided to alter that schedule and to close the store at 3

---

[1] The declaration of Sue Vandersall in support of CVS' motion states that this temporary program was first advertised in April 2004, and the positions were filled by the fall. The program was completed by December 2004. (Doc. 36, Exhibit 4)

p.m. on Sunday, which happened to be Easter Sunday.

Perkins does not dispute that store opening and closing schedules are set by CVS management, not by individual store managers.  Nevertheless, Perkins decided it would be prudent to close earlier on Sunday, given that a nearby large retail store would be closed, that CVS Easter products had not yet been put on after-Easter sale, and that he needed to reduce his total staff hours for that week.  Perkins did not inform Seimetz of his decision to close the store early.

Perkins states that Seimetz came to the Harrison store the next day, to check on sales and the store's condition.  Perkins told Seimetz he was having increasing problems with his hearing, and had heard that a Texas temporary position might still be open.  As Perkins described this conversation in his deposition:

> I needed something like that because I didn't
> want a lot of customer problems. . . .  And I
> explained to him I thought I'd be going deaf
> within a little bit of time because
> everything was getting worse.  The hearing
> was getting worse.  I couldn't hear the back
> doors.  Everything was blending in.

(Perkins Deposition, pp. 81-82.)  On his way out of the store, Seimetz asked Perkins if he had closed the store early on Easter Sunday, and why he had done that.  After Perkins explained his reasons, Seimetz said it sounded like a good idea, but if Perkins ran into that problem again to let him know.

Seimetz testified that he learned about the early closing of

-5-

Perkins' store from an anonymous caller the next day. Seimetz called the store's pharmacist to verify the story. Seimetz then tried to discuss the issue with Bob Komorowski, the CVS regional manager, but Komorowski was on vacation. Seimetz briefly talked with an HR representative, Gerald Bush, about Perkins' action. Seimtez described the CVS store opening/closing hours policy as "set in stone" by the company, and testified he had never heard of another retail manager varying from that policy without express pre-approval of management. (Seimetz Deposition pp. 40-48.)

When Komorowski returned from vacation the following week, he agreed with Seimetz's decision to fire Perkins because of Perkins' violation of the closing-hour policy. On April 5, 2005, Seimetz delivered the news to Perkins that he was officially terminated, and asked him to turn in his keys.

Procedural History

On May 4, 2005, Perkins filed a pro se charge with the EEOC, alleging that he was terminated due to his disability and his age. Perkins completed a twelve-page questionnaire describing his claims. Question 6 of the EEOC's "ADA INTAKE QUESTIONNAIRE" (Doc. 38, Exhibit 3) asked Perkins to describe how CVS management became aware of his disability. Perkins responded that he told his district manager, Terry Meyer, about the difficulties his employees were reporting to him, and that Meyer told Perkins to

simply keep him informed if his condition grew worse. Perkins also stated that he told Dave Seimetz about his hearing problem when Seimetz became district manager, and that Perkins had asked Seimetz for a new position with CVS because of his difficulties.

After receiving a right-to-sue letter, Perkins filed a pro se complaint in this action on December 21, 2005. He later obtained counsel and filed an amended complaint (Doc. 13), alleging that he had been terminated because of his hearing disability, in violation of the ADA. (Perkins abandoned his age discrimination claim, and it is no longer at issue.)

**DISCUSSION**

1.  Summary Judgment Standards.

The standards for summary judgment are well established. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253 (1968)). The Court is not duty bound to

search the entire record in an effort to establish a lack of material facts. Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992); InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. den., Superior Roll Forming Co. v. InterRoyal Corp., 494 U.S. 1091 (1990). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. "If the evidence is merely colorable, . . . , or is not

significantly probative, . . . , the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

Although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir. 1979), cert. dismissed, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (citations omitted).

2.  Claims under the Americans With Disabilities Act.

42 U.S.C. §12101, et seq., prohibits discrimination based on an employee's disability, and imposes an affirmative obligation on employers to provide a reasonable workplace accommodation to a disabled employee. Perkins contends that CVS terminated him because of his hearing deficit, and denied his requests for accommodation by transferring him to the Harrison store, and not transferring him to the Texas temporary job.

Perkins has no direct evidence of disability discrimination. ADA claims based on indirect evidence of discrimination are evaluated under the familiar McDonnell-Douglas burden-shifting framework. Perkins must first establish a prima facie case. If

-9-

he does so, CVS must articulate a legitimate, nondiscriminatory reason for its decision to terminate Perkins. Perkins must then show that reason is pretextual. Under Manzer v. Diamond Shamrock Chemicals Corp., 29 F.3d 1078, 1084 (6th Cir. 1994), pretext can be established by evidence that (1) the proffered reasons had no basis in fact, (2) the reasons did not actually motivate his discharge, or (3) the reasons were insufficient to motivate discharge.

    A.    Perkins' Prima Facie Case.

Perkins may establish a prima facie discrimination claim by showing that: (1) he is disabled; (2) he is qualified for his job, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) CVS knew or had reason to know of Perkins' disability; and (5) Perkins' position remained open while CVS sought other applicants, or the disabled individual was replaced. See Hedrick v. W. Reserve Care System, 355 F.3d 444, 453 (6th Cir. 2004), citing Monette v. Elec. Data Systems Corp., 90 F.3d 1173, 1186-87 (6th Cir. 1996). Only the first factor - whether Perkins is disabled - is seriously disputed.

The ADA defines disability as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. §12102(2). The fact that Perkins has a hearing deficit is not enough to trigger ADA protection. Under subsection (A), the impairment must result in a "substantial limitation" in one or more major life activities as compared to the general population. See <u>Toyota Motor Mfg. Ky. v. Williams</u>, 534 U.S. 184, 195 (2002). The EEOC regulations define "substantial limitation" as:

> (i) **Unable** to perform a major life activity that the average person in the general population can perform; or
>
> (ii) **Significantly restricted** as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 CFR §1630.2(j) (emphasis added). Factors that the court should consider to determine whether the "significantly restricted" test is met include the nature and severity of the impairment, its duration, and whether it is permanent and causes long-term impacts. See 29 CFR §1630.2(j)(2). And, 29 CFR §1630.2(i) defines major life activities as those central to daily life, including walking, seeing, **hearing**, speaking, breathing, learning, and working.

    CVS disputes that Perkins' hearing deficit caused a "substantial limitation" in any major life activity. CVS argues that Perkins has described some occasional difficulty hearing

other people, or a need to turn up the volume on the television or the radio.  CVS notes that Perkins was able to perform his job, as evidenced by his own testimony and the lack of any adverse reports from his supervisors.  The only specific impacts on his job that Perkins could identify were the 2005 incident with the CVS customer (who told the cashier that Perkins was ignoring her), his employees' sporadic comments about his hearing, and the 1999 incident with his supervisor which prompted his hearing evaluation.  CVS argues this is not enough to constitute a substantial limitation on his hearing, or his ability to work.

    CVS also cites Perkins' admission that, when he did obtain hearing aids in 2006, his hearing improved.  Perkins described a period of adjustment to his aids, and discomfort in wearing them for extended periods of time, but acknowledged that his hearing improved when he wore the aids.  The Court may consider post-termination evidence of the nature and extent of a disability, including successful treatment, in determining whether the disability "substantially limited" a major life activity at the time of the termination.  See Swanson v. University of Cincinnati, 268 F.3d 307 (6th Cir. 2001).  And clearly, under Sutton v. United Air Lines, 527 U.S. 471 (1999), this Court must consider Perkins' use of hearing aids.  The fact that he obtained them only after his termination does not alter this requirement.

Sutton also makes clear that the determination of whether a disability is "substantially limiting" is a fact-intensive one, and must be made on a case by case basis.  The dispositive question is whether Perkins has produced sufficient evidence to create a jury question on whether he is "significantly restricted as to the condition, manner or duration under which [he] can hear" as compared to the average person.  This Court does not doubt that the hearing problems Perkins describes, both with and without his aids, are significant.  There is nothing in the record suggesting that his hearing loss is temporary.  Rather, Perkins' testimony (and the VA disability rating) support a conclusion that it is permanent, and that it has and will continue to have a significant impact on his life.  The Court need not delve into whether his hearing deficit limited his ability to work, because hearing is itself a major life activity.  The Court therefore concludes that Perkins has established a prima facie case for purposes of withstanding CVS' summary judgment motion.

  B. <u>CVS Legitimate Justification for Perkins' Termination</u>.

CVS contends it has presented a legitimate business justification for Perkins' termination: his failure to adhere to the company-wide policy on store closing hours.  Perkins does not dispute the fact that the store closing hour was not his decision to make.  He also knew that company policy required him to get

permission before he deviated from the company-dictated hours. CVS has filed declarations establishing that at least three other store managers have been terminated in the last few years for doing the very same thing - closing early without authorization. See Declarations of Terry Meyer and Dennis Poovey (Doc. 36, Exhibits 2 and 3).

As has been often observed, the district court's role is not to second guess business judgments or act as a "super-personnel department." Hedrick v. Western Reserve Care System, 355 F.3d 444, 462 (6th Cir. 2003). The Court concludes that CVS has established a legitimate basis for Perkins' termination.

C. Pretext.

Perkins must come forward with evidence under one of the three Manzer prongs to establish pretext. Perkins does not contest the factual basis of his termination, as he admitted closing his store early in violation of company policy. As noted above, CVS presents undisputed evidence that it has terminated three other store managers after each of them violated the same store closing hour policy. This evidence negates any argument that the policy breach was insufficient to motivate his discharge, or that Perkins was subjected to disparate treatment because of his disability.

Perkins argues that the stated reason for his termination did not **actually** motivate his discharge. He relies on his

-14-

thirty-year unblemished record, the lack of a specific written policy prohibiting early closing without supervisory approval, CVS' knowledge of his hearing deficit, and his unsuccessful attempts to secure a reasonable accommodation in his job. Perkins contends this is enough circumstantial evidence to create a jury question on whether his disability played a role in his termination.

In order to challenge the actual motivation of the employer, a plaintiff must do more than simply deny the employer's explanation, or attack the decision-maker's credibility. See, e.g., White v. Columbus Metropolitan Housing Authority, 429 F.3d 232 (6th Cir. 2005). White sued her employer after she was rejected for a promotion and the chosen applicant (Walker) was a male. CMHA established a legitimate, non-discriminatory reason for not hiring White, because Walker was more qualified. To establish pretext, White urged that all of the circumstances surrounding CMHA's choice of Walker should be viewed under one or more of the Manzer factors. For example, she alleged that a CMHA manager was determined to hire a man; that CMHA accepted Walker's application after the deadline had passed, but ignored White's application; that CMHA violated its own internal policies of preferences for hiring internal candidates and an anti-nepotism policy; and that CMHA neglected to do a background check on Walker, which would have revealed a guilty plea to disorderly

conduct.  White also cited a comment by a hiring committee member who told White they wanted a "grass roots guy" for the position.  The Sixth Circuit concluded that, even if all of White's allegations were true, they would not establish that CMHA's legitimate reasons were a cover for a discriminatory motive:

> The most White can show, in viewing the evidence in the light most favorable to her, is that her application was not given as much attention as she would have liked.  However, she has not presented sufficient evidence for this court to conclude that the true reason behind the lack of attention is the fact that she is a woman.

Id., 429 F.3d at 246.  See also, Macy v. Hopkins County Bd. Of Education, ___ F.3d ___, 2007 U.S. App. LEXIS 8382 (6th Cir., April 12, 2007), relying on White and concluding that plaintiff had not established pretext by essentially challenging the veracity of the employer's explanation for her termination.

    A similar conclusion applies here.  The fact that CVS did not have a written guideline or policy prohibiting early store closing is not particularly helpful, given that Perkins admitted he knew what company policy was and that he did not follow it.  CVS was aware of his hearing deficit, but Perkins must do more than argue that the legitimate reason for terminating him was just a cover for disability discrimination.  In this regard, it is noteworthy that Seimetz also has a hearing deficit and wears hearing aids; it is unlikely that he harbored any discriminatory animus towards Perkins.

It may indeed seem harsh to fire a long-term employee with an unblemished work record for a single rule violation, which may have caused no serious economic harm to CVS. However, the Court may not deny a meritorious summary judgment motion because it disagrees with a company's personnel decision. The Court concludes that Perkins has not met his burden of establishing pretext.

D. <u>Reasonable Accommodation</u>.

Perkins claims that CVS denied him a reasonable accommodation to address his hearing deficit, first in 2003 when he was transferred over his objections to the Harrison store, and again in 2005 when he was not chosen for the temporary program in Texas. CVS contends that Perkins failed to exhaust his accommodation claim, and that the 2003 claim is untimely in any event. CVS also argues that Perkins had not established that he was entitled to any accommodation from CVS.

To establish an employer's failure to accommodate, Perkins must show that he has a disability, that he was otherwise qualified for his job, and that CVS refused a reasonable accommodation request. <u>Smith v. Ameritech</u>, 129 F.3d 857, 866 (6th Cir. 1997).

Perkins has not produced any evidence that the Harrison store environment was objectively or actually worse than the Cheviot store environment, such that his request to remain at the

Cheviot store could be deemed a request for a "reasonable accommodation." Perkins claims that he was **concerned before** the move about the high ceilings and larger physical space, but he offers no evidence that those concerns actually ripened into any increased difficulties, or that the changed environment negatively affected his job performance. Moreover, Perkins did not mention this incident in his EEOC charge and questionnaire, and did not file a charge on his 2003 claim within the 300 days required by statute. Thus this claim is time-barred.

Perkins' response to Question 10 of the EEOC "ADA Intake" questionnaire, which specifically inquires about accommodations, states he requested an assignment to work on store set-up in Texas in December 2004, but was told that someone else had filled that position. (See Doc. 38, Exhibit 3.) Perkins states that he later learned that the person did not actually take the job, and Perkins again asked Seimetz about a transfer. Perkins was acting pro se during his EEOC administrative process, and he clearly identified this issue on his questionnaire, which the Court concludes is sufficient for purposes of administrative exhaustion of this claim.

Assuming Perkins was qualified (based on his testimony that he had done a similar job for CVS when CVS bought Revco), the determinative question is whether the temporary position was a "reasonable accommodation" under the ADA. Perkins bears the

burden of proposing an accommodation, and demonstrating that his specific proposal is objectively reasonable.  <u>Monette v. Electronic Data Sys. Corp.</u>, 90 F.3d 1173, 1183 (6th Cir. 1996).  One measure of objective reasonableness is whether the proposed accommodation would be effective in accommodating the disability.  <u>Id</u>.

Perkins relies almost exclusively on his belief that the Texas position would not involve heavy customer contact to support his assertion that the position was a reasonable accommodation request.  The CVS job announcement in the record provides only general information about the job responsibilities and demands.  The record is largely silent about the specific conditions Perkins might have faced even if he had been given the job.  There is no information about the actual store locations, the noise level that Perkins might have faced, or the number of people he would have interacted with on a daily basis.  The CVS documents describing the program (Doc. 36, Vandersall Declaration Exhibits 1 and 3) refer to the positions as "trainers."  This implies more than a minimal amount of interaction and communication with other people.  Perkins does not establish how or why this position would be an **objectively** reasonable accommodation over his store manager job, which was in a known location with employees he had known for some time.  Perkins focuses solely on the customer contact aspect.  Assuming he is

correct that he would have little or no customer interaction, that one aspect cannot be evaluated in a vacuum to determine if the temporary position was **objectively** reasonable.

Based on these facts, the Court concludes that Perkins has not met his burden of establishing that a transfer to a Texas temporary position - even if one had been available in the spring of 2005 - was "objectively reasonable" under all the circumstances reflected in the record.  Therefore, his reasonable accommodation claim must fail.

## **CONCLUSION**

For all of the foregoing reasons, the Court grants Defendant's motion for summary judgment (Doc. 36).  THIS CASE IS CLOSED.

SO ORDERED.

DATED: May 30, 2007               s/Sandra S. Beckwith
                                  Sandra S. Beckwith, Chief Judge
                                    United States District Court